CASE 24—WILL CASE—SEPTEMBER 28.

# Harrel, &c., vs. Harrel, &c.

APPEAL FROM THE DAVIESS CIRCUIT COURT.

1. Gross inequality in the dispositions made by a will, where no reason for it is suggested in the will itself, requires satisfactory evidence that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind.

· 2. See the opinion for the facts showing incapacity on the part of the testator, and the undue influence exerted by his wife.

W. ANTHONY, G. H. YEAMAN, and J. W. KINCHELOE, for appellants.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

A paper purporting to be the last will of William Harrel, deceased, after probate in the county court of Daviess, was, on an appeal to the circuit court, set aside by the verdict of a jury and the judgment of that court. From that judgment the propounders of the will appeal to this court.

When he acknowledged the testamentary document, the decedent, about 70 years old, was confined to his bed by an inflammatory disease, which appeared very distressing, and made him frequently both "drowsy" and "flighty," and of which he died about two days after the attestation.

At his death he owned the homestead tract of land, worth $10,000; ten slaves, valued at $4,000; stock worth $1,125; other personalty, estimated at $1,673; and $682 cash in hand; and there is no proof that he owed any debts. He left four children and some grandchildren, none of whom (children or grandchildren) had been advanced by him.

The testamentary provisions are simple and short; and give to his widow, whom he had married not more than eight years before, and to his son James, his whole estate of every kind during her life, remainder to said James, excepting only the slaves, which were to be equally divided between James and his brother Jonathan, sisters Hannah Humphrey and Mary Ann Patrick, and the children of a deceased sister, Lydia Beard.

For such gross inequality no reason is suggested in the document itself or by the proof on the trial. The testator had an unquestionable power to make such a will. But its apparent unreasonableness requires satisfactory evidence that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind. And all this has not, in our opinion, been shown by the testimony with sufficient assurance.

No witness expressed the opinion that he had not a disposing mind, and the subscribing witnesses, and most others, testified to some facts conducing to the abstract conclusion that he had. But all of them prove other facts, conflicting, in a greater or less degree, with that conclusion; and these we will summarily notice in two classes—1st. As illustrative of incapacity; and, 2d. As indicative of extraneous influence controlling his enfeebled and disturbed mind.

1. He was often in a state of stupor, and, when roused, was generally flighty; but soon, while awake, became apparently rational. He dictated the substance of the legatory provisions as written. But he became comatose while the draftsman was writing, and, though soon awakened to apparent self-possession and reason, yet a watcher attended to his pulse so as to announce whether and when the pulsations should indicate an incapacitating perturbation of mind.

2. His second and surviving wife—no mother of any child of his—often teased him to make a will. These annoying importunities were repeated from a short time after their marriage to a few weeks before he was struck down by the fatal sickness. He always resisted those overt and reiterated solicitations, and, on one occasion, she said that "the old devil" would not do as she wished. From such proof of open

solicitations, there can be no doubt that secret appeals, more frequent and urgent, were continued in various ways, and it is not improbable that her selfish perseverance succeeded, at last, in bowing his stubborn neck to her yoke when feeble and hopeless on his death-bed. The proof is clear that he often, for years, declared that the law made the best will, and that he would never make one. He also said, not long before his death, that he desired an equal distribution of his estate among his children; and, not more than three weeks before his death, declared that he would never make a will. In confirmation of that as his fixed sentiment, he, by extraordinary remonstrances, prevailed on one of his sons to die intestate.

Now, what changed that settled purpose, for the first time, when he was expecting to die every hour, and was scarcely able to think deliberately or exercise a prudent volition? The record affords no clue to a consistent answer, unless his wife's influence, aided, perhaps, by the co-operation of his son James, finally subjected his will and changed his long-cherished purpose of intestary and legal equality. And, considering all the facts, the presumption is strong that this was the controlling cause. In the disturbed and flitting condition of his mind, the impress of that influence and dictation might have enabled him mechanically to dictate the devise to his wife and son James of his whole estate, without classifying it or enumerating the articles. And this is rather confirmed by the proof that he did not suggest, but seemed to pretermit, the ulterior provision as to the slaves until his attention was called to that subject.

Whilst, therefore, the testamentary right should be carefully guarded and faithfully vindicated, this court should be vigilant to prevent, as far as it can, the abuse of that right by withholding its approving seal from a document, so unnatural and so questionable as to freedom and capacity, as that now under its final consideration. To establish it as a valid will would encourage a prostitution of the testamentary power. To reject it would increase the value of that power, and tend to frustrate improper intermeddling, and especially *in extremis*, to disturb the just equality of the law.

In a case of such unaccountable inequality, justice and policy require clear and satisfactory proof of a free, deliberate, and disposing mind, before such a paper, as that now before us, shall be established by our judgment as a true and valid will. We cannot feel that we have that proof. On the contrary, we are strongly inclined to the deduction that the document was not the spontaneous and legitimate offspring of a self-poised, settled, and disposing mind. And this conclusion, were it more doubtful than it is, might be made preponderant by the verdict of a jury of neighbors confirmed by the judgment of the circuit court.

Wherefore, this court adjudges that the document in question is not the will of William Harrel, and remands the case to the circuit court, with instructions to enter this judgment and certify it to the county court of Daviess, to be recorded as the judgment of that court.